UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| Conservation Law Foundation, Inc.,   ) | Case No. _____ |
| ) | |
| Plaintiff,   ) | **COMPLAINT FOR** |
| ) | **DECLARATORY AND INJUNCTIVE** |
| ) | **RELIEF AND CIVIL PENALTIES** |
| v.   ) | |
| ) | |
| Wequassett Inn LLP, d/b/a   ) | |
| Wequassett Resort and Golf Club, and ) | |
| Weston & Sampson, Inc.,   ) | |
| ) | (Federal Water Pollution Control Act, |
| Defendants.   ) | 33 U.S.C. §§ 1251 to 1387) |
| _____ ) | |

## INTRODUCTION

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, *et seq.* ("Clean Water Act," "CWA," or "Act"). Plaintiff Conservation Law Foundation, Inc. ("CLF") seeks declaratory judgment, injunctive relief, and other relief as appropriate to remedy violations of the Clean Water Act by Wequassett Inn LLP (d/b/a Wequassett Resort and Golf Club) and Weston & Sampson, Inc., which is the operator of the Wequassett Resort and Golf Club Sewage Disposal System (hereinafter, collectively, "the Defendants").

2.      Section 301(a) of the Clean Water Act makes "the discharge of any pollutant by any person . . . unlawful" except when in conformance with enumerated statutory provisions, including the requirement that a discharger obtain and comply with a NPDES permit under Section 402 of the Act. *See* 33 U.S.C. §§ 1311(a), 1342.

3.      Defendants own and/or operate a Sewage Disposal System at the Resort that consists of collection pipes and pumps, a treatment system or systems, and a soil absorption disposal field which disperses treated wastewater through subsurface pipes ("the Sewage Disposal System").

4.      The Sewage Disposal System discharges and adds pollutants to Pleasant Bay and Round Cove, both of which are Waters of the United States and waters of the Commonwealth of Massachusetts.

5.      Pollutants from the Sewage Disposal System are discharged from discrete conveyances directly to Pleasant Bay and Round Cove through hydrologically connected groundwater.

6.      The discharge from the Sewage Disposal System contains pollutants as defined by the Act, and adds those pollutants to the Receiving Waters.

7.       A NPDES permit for this discharge to Pleasant Bay and Round Cove is required under Section 402 of the CWA, 33 U.S.C. § 1342, because the Sewage Disposal System is a "point source" that is adding pollutants to navigable waterways. 33 U.S.C. § 1362(14).

8.      Defendants' violations include past and ongoing discharges of pollutants from the Sewage Disposal System into Pleasant Bay and Round Cove without authorization under any National Discharge Elimination System ("NPDES") permit.

9.      Defendants' past and ongoing discharges of pollutants from their Sewage Disposal System have at no time prior to this complaint been authorized by any NPDES permit. Defendants have operated and continue to operate the Facility in violation of the Clean Water Act.

## JURISDICTION AND VENUE

10.     Plaintiff brings this civil suit under the citizen suit provision at Section 505 of the Clean Water Act, 33 U.S.C. § 1365.

11.     This Court has subject matter jurisdiction over the parties and this action pursuant to Section 505(a)(1) of the Act, 33 U.S.C. § 1365(a)(1); 28 U.S.C. § 1331 (an action arising under the Constitution and laws of the United States); and 28 U.S.C. §§ 2201-2202 (declaratory judgment).

12.     On June 21, 2018, Plaintiff notified Defendants of its intention to file suit for violations of the Clean Water Act, in compliance with the statutory notice requirements under Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), and the corresponding regulations located at 40 C.F.R. § 135.2. A true and accurate copy of Plaintiff's Notice Letter (the "Notice Letter") is appended as Exhibit A.

13.     More than sixty days have passed since Plaintiff served the Notice Letter on Defendants, during which time neither the Environmental Protection Agency ("EPA") nor the Commonwealth of Massachusetts has commenced an action to redress the violations alleged in this Complaint. 33 U.S.C. § 1365(b)(1)(B).

14.      Venue is proper in the U.S. District Court for the District of Massachusetts pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## PARTIES

15.     Plaintiff CLF is a nonprofit, member-supported organization dedicated to protecting New England's environment.

16.     CLF is incorporated under the laws of Massachusetts with its principal place of business at 62 Summer Street, Boston, MA 02110.

17.     For over fifty years, CLF has worked to protect the health of New England's waterways, including addressing the significant water quality impacts of sewage pollution. CLF has a legacy of working to protect the waters of Cape Cod.

18.     CLF actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates actions on behalf of itself and its members.

19.     CLF has over 5,100 members, including more than 2,900 members in Massachusetts. CLF members use and enjoy New England's waterways for recreational and aesthetic purposes, including boating, swimming, fishing, hunting, and sightseeing.

20.     The waters used and enjoyed by CLF's members include, but are not limited to, the waters of the United States adversely affected by Defendants' unpermitted discharges of pollutants.

21.     Wequassett Inn LLP is a limited liability partnership organized under the laws of the Commonwealth of Massachusetts with a principal address of Route 28 & Pleasant Bay Road, East Harwich, MA 02645.

22.     Wequassett Inn LLP operates a seasonal resort hotel on Cape Cod under the name Wequassett Resort and Golf Club located at 2173 and 2171 Route 28, Harwich, MA 02645 on the shores of Pleasant Bay and Round Cove.

23.     Wequassett Inn LLP and the Wequassett Resort and Golf Club are collectively referred to herein as "the Resort."

24.     The Resort offers both guest room accommodations and food and beverage service, along with recreational activities.

25.     The Resort is located next to the Cape Cod National Golf Club—an eighteen-hole golf course restricted to Cape Cod National Golf Club members and Resort guests.

26.     The Resort's website states that the Resort has 120 guest rooms and suites.

27.     The Resort's 2016 Groundwater Discharge Permit issued by Massachusetts Department of Environmental Protection ("MassDEP") stipulates that the Resort has 104 guest units.

28.     According to the Resort's website, the cost of a room at the Resort ranges from approximately $500 per night up to $1,500 per night.

29.      In addition to lodging, amenities at the Resort include five (5) restaurants, two (2) pools, and four (4) tennis courts. *See Resort*, WEQUASSETT RESORT AND GOLF CLUB, https://wequassett.com/ (last visited Aug. 20, 2018).

30.     Weston & Sampson, Inc. is an engineering consulting firm with a principal address of 5 Centennial Dr., Peabody, MA 01960.

31.     Founded in 1916, Weston & Sampson, Inc. now has over 500 employees.

32.     Weston & Sampson, Inc. has operated the Sewage Disposal System for the Resort since at least 2015.

33.     Weston & Sampson, Inc. prepared the Resort's application for their 2017 MassDEP Groundwater Discharge Permit.

34.     Weston & Sampson, Inc. also has prepared the Resort's legally required groundwater discharge monitoring report submissions for MassDEP since at least May 2016.

35.     As of 2015, correspondence to MassDEP indicated that Christopher Vigneau, an employee of Weston & Sampson, Inc. was the operator of the Resort's Sewage Disposal System.


## STATUTORY AND REGULATORY BACKGROUND

36.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), strictly prohibits the discharge of any pollutant into waters of the United States from a point source, unless the discharge complies with various enumerated sections of the Act. Among other things, Section 301(a) prohibits

discharges not authorized by, or in violation of, the terms of a valid NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

37.     Section 502(12) of the CWA 55 U.S.C. § 1362(12), defines the "discharge of a pollutant" as "[a]ny addition of any pollutant to navigable waters from any point source." The regulations that implement the CWA expand this definition to also include "[a]ny addition of any pollutant or combination of pollutants to . . . the ocean from any point source other than a vessel or other floating craft . . . includ[ing] additions of pollutants into waters of the United States from . . . discharges through pipes, sewers, or other conveyances . . . which do not lead to a treatment works." 40 C.F.R. § 122.2.

38.     Section 502(6) of the CWA, 33 US.C. §1362(6), defines "pollutant" to include, among other things, "sewage," "sewage sludge," "biological materials," and "chemical wastes" discharged into water.

39.     Section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14), defines "point source" broadly to include "any discernible, confined and discrete conveyance, including, but not limited to, any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."

40.     Section 502(7) of the CWA, 33 U.S.C. § 1362(7), defines "navigable waters" as "the waters of the United States, including the territorial seas."

41.     Under the regulations that implement the CWA, "waters of the United States" includes, among other things: "[a]ll waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;" and "[t]he territorial seas." 40 C.F.R. § 122.2.

42.     Section 502(8) of the CWA, 33 U.S.C. § 1362(8), defines "territorial seas" as "the belt of the seas measured from the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters, and extending seaward a distance of three miles."

43.     A discharge of pollutants from a point source to navigable waters is covered by the Clean Water Act even if the route that the pollution travels from the point source to the navigable water is underground, traveling through groundwater. Groundwater acts as a conduit, conveying pollution from the point source of discharge to the navigable waters.

44.     EPA, the agency charged by Congress with interpreting and applying the Clean Water Act, has consistently explained that the CWA applies "to discharges of pollutants from a point source via ground water that has a direct hydrologic connection to surface water." *NPDES Permit Regulation and Effluent Limitation Guidelines and Standards for Concentrated Animal Feeding Operations*, 66 Fed. Reg. 2960, 3017 (Jan. 12, 2001).

45.     The Clean Water Act requires NPDES permit coverage where pollutants are discharged to groundwater that is directly hydrologically connected to surface water.

46.     Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation."

47.     Actions under Section 505(a) of the Act include an action seeking remedies for unauthorized discharges in violation of Section 301 of the Act, 33 U.S.C § 1311, as well as for failing to comply with one or more permit conditions in violation of Sections 402 and 505(f) of the Act, 33 U.S.C. §§ 1342, 1365(f).

48.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day per violation for all violations occurring from January 12, 2009 through November 2, 2015; up to $51,570 per day per violation for all violations occurring after November 2, 2015 assessed on or after August 1, 2016 but before January 15, 2017; up to $52,414 per day per violation for all violations occurring after November 2, 2015 and assessed on or after January 15, 2017 and up to $53,484 per day per violation for violations occurring after November 2, 2015 and assessed on or after January 15, 2018, pursuant to sections 309(d) and 505(a) of the act, 33 U.S.C. §§ 1319(d), 1365(a), and 40 C.F.R. §§ 19.1–19.4.

## FACTS

### The Sewage Disposal System

49.     Defendants have owned and/or operated the Sewage Disposal System since at least 2013 and continue to own and/or operate the Sewage Disposal System.

50.     The Sewage Disposal System was installed in 2009.

51.     The Sewage Disposal System has the capacity to treat 45,000 gallons of sewage per day.

52.     The Sewage Disposal System consists of collection pipes and pumps, a treatment component, and a soil absorption disposal field which discharges treated wastewater through subsurface pipes into the soil and groundwater.

53.     The Sewage Disposal System discharges pollutants including, but not limited to, nitrogen into the groundwater. These pollutants are carried a short distance with the flowing groundwater and are discharged and added into Pleasant Bay and Round Cove.

54.     The Sewage Disposal System is a point source as defined by section 502(14) of the Clean Water Act.

55.     The Sewage Disposal System collects and conveys sewage and wastewater from buildings and facilities owned and operated by the Resort.

56.     Raw sewage is conveyed through collection pipes to the treatment component of the Sewage Disposal System.

57.     Collected wastewater is treated by flowing into one of two parallel 14,500 gallon anoxic/equalization tanks consisting of an equalization section (which accumulates and consolidates the wastewater into batches), a settling zone, and a sludge storage section.

58.     After leaving the anoxic/equalization tanks, the collected wastewater is pumped into parallel 10.5' x 9.5' I.D. Amphidrome-brand reactors which provide biological nutrient removal with two bioreactor stages.

59.     After passing through the treatment area of the Sewage Disposal System, wastewater is piped to the Resort's soil absorption disposal fields.

60.     Soil absorption systems are designed to allow a planned release of contaminants into the groundwater. *See* U.S. EPA, *Decentralized Systems Technology Fact Sheet: Septic Tank – Soil Absorption Systems*, 4 (Sept. 1999),   https://www.h-gac.com/community/water/ossf/DSTFS_Septic-Tank_Soil-Absorption-Systems.pdf.

61.     The Resort's disposal fields consist of two networks of perforated pipe—each approximately 90-feet long and 90-feet wide.

62.     The disposal fields' networks of pipes run through large trenches which contain gravel covered by a layer of soil.

63.     The disposal fields are designed to discharge collected and treated effluent into the soil and groundwater.

64.     The disposal fields discharge collected and treated effluent into the groundwater.

65.     The treatment component of Defendants' Sewage Disposal System cannot treat excess flows when sewage inflows from its collection component exceed its maximum capacity of 45,000 gallons per day.

66.     When Defendants' inflows of untreated wastewater exceed 45,000 gallons per day, improperly treated and/or untreated sewage is discharged through the disposal fields.

67.     Defendants discharged sewage in volumes that exceeded the treatment capacity of their Sewage Disposal System by 8,979, 11,029, and 4,269 gallons per day during July, August, and September 2015 respectively.

68.     During July, August, and September 2015, Defendants discharged improperly treated and/or untreated sewage into and through the soil absorption disposal field.

69.     During July, August, and September 2015, Defendants discharged improperly treated and/or untreated sewage into the soil and groundwater.


**Pollutants Discharged by Defendants**

70.     Defendants discharge pollutants from the Sewage Disposal System including but not limited to nitrogen (which may be present in the form of ammonia, nitrate, nitrite, and/or Total Kjeldahl Nitrogen ("TKN")), phosphate, orthophosphate, and chloride.

71.     Dating back to 2013, Defendants have continually discharged nitrogen from the Sewage Disposal System.

72.     According to data submitted by Defendants to MassDEP, Total Nitrogen discharge levels have been regularly reported at concentrations of up to at least 28.45 mg/L.

73.     Other pollutants that may also be present in Defendants' sewage discharge include ammonium, additional nutrients that can cause or contribute to eutrophication of downstream

waters including other nitrogenous molecules, organic material and other wastes that create chemical and biological oxygen demand in receiving waters, bacteria, viruses, heavy metals, substances that alter soil and ground water pH, and a variety of pharmaceuticals: including drugs, medications, antibiotics, and hormones.

74.     Many of the pharmaceutical contaminants that may be present in Defendants' discharges are endocrine disrupting chemicals, including nonylphenol, octylphenol, and some of their ethoxylated chains, 17β-estradiol, estriol, 17α-ethynylestradiol (a contraceptive hormone) and bisphenol-A.

75.     Endocrine disrupting chemicals can cause significant harm to aquatic organisms.

76.     Defendants have discharged pollutants to both Pleasant Bay and Round Cove without a NPDES permit on each day of the five years preceding the date of the Notice Letter.

**Pollutant Discharges from the Sewage Disposal System into Pleasant Bay and Round Cove**

77.      The Sewage Disposal System discharges pollutants into soil and groundwater at the location of the disposal fields.

78.     The Sewage Disposal System is located within the Pleasant Bay watershed, approximately 250 feet from Round Cove's shore and approximately 700 feet from Pleasant Bay's shore.

79.     The groundwater below the disposal fields is directly hydrologically connected to Pleasant Bay and Round Cove.

80.     The groundwater beneath and surrounding the disposal field flows towards Round Cove in the southern portion of the facility and towards Pleasant Bay in the northern portion of the facility.

81.     The pollutant-carrying groundwater beneath the Sewage Disposal System flows at an average rate of one foot per day through sandy, glacial outwash.

82.     Groundwater containing discharged pollutants from the Sewage Disposal System discharges and adds pollutants from the Resort to Pleasant Bay and Round Cove in under 200 days (less than 7 months).

83.     Groundwater elevations beneath the Sewage Disposal System are less than 10 feet above mean sea level.

84.      Groundwater elevations beneath the Sewage Disposal System range from approximately 5.10 to 6.10 feet above mean sea level. Groundwater elevations are the highest (approximately 40 feet above sea level) north and west of the Sewage Disposal System, with the lower elevations located by the shoreline to the east and south.

85.     Pollutants discharged from the Resort's Sewage Disposal System are discharged and added directly to Pleasant Bay and Round Cove via these hydrologic connections.

**Pleasant Bay and Round Cove**

86.     Pleasant Bay and Round Cove are coastal inlets of the Atlantic Ocean; Round Cove is a sub-embayment of Pleasant Bay. They are both part of the Pleasant Bay and the Cape Cod Watersheds.

87.     Pleasant Bay and Round Cove are both "territorial seas" and "waters of the United States" as defined in 33 U.S.C. § 1362(8) and 40 C.F.R. § 122.2. Therefore, Pleasant Bay and Round Cove are "navigable waters" as defined in 33 U.S.C. § 1362(7).

88.     In or around 2008, Pleasant Bay was added to the list of impaired waters developed by Massachusetts under section 303(d) of the CWA (33 U.S.C. § 1313(d)) for excessive nitrogen loading.

89.     Pleasant Bay has been designated as impaired for fish, shellfish, and wildlife protection and propagation due to total nitrogen. *See 2014 Waterbody Report for Pleasant Bay (MA96-77)*, U.S. EPA (2014),

https://ofmpub.epa.gov/waters10/attains_waterbody.control?p_list_id=&p_au_id=MA96-77&p_cycle=2014&p_state=MA.

90.     The Massachusetts Executive Office of Energy and Environmental Affairs, the Department of Environmental Protection, and the Bureau of Resource Protection issued and approved of the Pleasant Bay System Total Maximum Daily Loads for Total Nitrogen ("TMDL"). *See* Mass. Exec. Office of Energy & Envtl. Affairs et al., *FINAL Pleasant Bay System Total Maximum Daily Loads for Total Nitrogen* (May 2007), https://www.mass.gov/files/documents/2016/08/op/pbtmdl.pdf.

91.     The eutrophication of the Pleasant Bay System is the result of excessive nitrogen loading. *Id.* at 1.

92.     Present controllable watershed nitrogen loading in Pleasant Bay was measured at 29.28 kg/day. *Id.* at 19.

93.     The target threshold watershed nitrogen load in Pleasant Bay is 21.85 kg/day. To reach this goal, controllable watershed loads would need to be reduced by 25%. *Id.*

94.     Excessive nitrogen has added to the impairment of the environmental quality of Pleasant Bay System coastal waters (a system of seventeen embayments and sub-embayments, including Pleasant Bay and Round Cove, that surround Pleasant Bay). As a result of this environmental impact, commercial and recreational uses of these waterbodies will be greatly reduced, and could cease altogether. *See* FINAL *Pleasant Bay System TMDL*, at ii, 6.

95.     Excessive nitrogen in Pleasant Bay and Round Cove is indicated by loss of eelgrass beds, undesirable increases in macro algae, periodic extreme decreases in dissolved oxygen

concentrations that threaten aquatic life, and/or reductions in the diversity of benthic animal populations. *Id.* at ii, 4, 7, 8.

96.    The Pleasant Bay System is eutrophic, as indicated by dissolved oxygen levels, nutrient loading, aesthetics (including scum and objectionable odor, color, taste, or turbidity), and/or excess plant biomass and nuisance vegetation. *See* FINAL *Pleasant Bay System TMDL*, at 11.

97.    Consistent with its eutrophic state, the Pleasant Bay System suffers from nuisance populations of macroalgae and increased concentrations of phytoplankton and epiphyton (mats of organisms, including algae, cyanobacteria, and microbes which grow on other plants), which have impaired the ecology of these waters. *Id.* at 1.

98.    The Pleasant Bay System is at risk of further eutrophication from high nutrient loads in the groundwater and runoff from its watershed. *Id.* at 2.

99.    In or around 2008, Round Cove was added to the list of impaired waters developed by Massachusetts under section 303(d) of the CWA, 33 U.S.C. § 1313(d), for excessive nitrogen loading and fecal coliform.

100.    MassDEP and the EPA have designated Round Cove as impaired for fish, shellfish, and wildlife protection and propagation under Section 303(d) of the CWA due to total nitrogen. One of the four sources for this nitrogen is sewage discharge from "On-Site Treatment Systems (Septic Systems And Similar Decentralized Systems)." *See 2014 Waterbody Report for Round Cove (MA96-75)*, U.S. EPA (2014),

https://ofmpub.epa.gov/waters10/attains_waterbody.control?p_list_id=&p_au_id=MA96-75&p_cycle=2014&p_state=MA.

101.    The present controllable watershed loading in Round Cove was measured at 4.23 kg/day. The target threshold watershed load in Round Cove is 2.96 kg/day. Controllable watershed loads

would need to be reduced by 30% to achieve the threshold loads. *FINAL Pleasant Bay System TMDL*, at 19.

102.   Nitrogen loading in Round Cove from septic systems was 3.16 kg/day. This is approximately 24.7% of the waterbody's total nitrogen load from all sources (12.81 kg/day). *Id.* at 18.

103.   The primary nitrogen management goal in Round Cove is the restoration and maintenance of healthy animal communities. This goal forms the basis for the target threshold watershed load. *Id.* at 16.


**Defendants Are Not Covered Under a NPDES Permit**

104.   Defendants' pollutant discharges into waters of the United States are not covered under any NPDES permit pursuant to 33 U.S.C. § 1342.

105.    Defendants have been, and are, discharging pollutants to waters of the United States in violation of 33 U.S.C. § 1311(a) which prohibits discharges of pollutants unless authorized and controlled by a NPDES permit.

106.   Defendants currently operate their Sewage Disposal System pursuant to Individual Groundwater Discharge Permit No. 851-1 issued by MassDEP in November 2017.

107.   Prior to issuance of the current MassDEP permit in 2017, Defendants operated the Sewage Disposal System under previously issued Individual Groundwater Discharge permits.

108.   None of the MassDEP Groundwater Discharge Permits have been a NPDES permit issued pursuant to Section 402 of the Clean Water Act.

109.   The state Groundwater Discharge Permits were not and are not designed to authorize discharges to waters of the United States in compliance with the CWA and do not impose

conditions on the discharges that are necessary to protect waters of the United States and conform to federal law.

110.    The discharge limitation for Total Nitrogen set by the Groundwater Discharge Permit at 10 mg/L is not a technology-based effluent limitation—as required by Section 301 of the CWA.

111.    The 10 mg/L limit is the EPA's maximum contaminant limit for nitrogen in drinking water (a standard that has also been adopted by Massachusetts state regulation).

112.    The 10 mg/L limit was set in reference to human health with the goal of protecting infants from methemoglobinemia or blue-baby syndrome, a potentially fatal blood disorder that can result from high levels of nitrate.

113.    The 10 mg/L limit is not a surface water quality-based effluent limitation.

114.    Discharges of nitrogen from the Resort Sewage Disposal System cause and contribute to eutrophication, algae blooms, and fish kills in Pleasant Bay Round Cove.


**Harms to Plaintiffs from Defendants' Pollutant Discharges**

115.    Cape Cod's beautiful waters, shorebirds, and marine wildlife attract many CLF members to its shores. Harwich and Pleasant Bay are popular vacation spots on Cape Cod.

116.    CLF members use Cape Cod's waters, including Pleasant Bay and/or Round Cove, to swim, boat, paddleboard, and fish; while others enjoy birdwatching on the beaches or looking out at the water.

117.    Excess nitrogen levels and eutrophication in Pleasant Bay and Round Cove caused by nitrogen pollution has negatively impacted CLF members' ability to recreate in and near Pleasant Bay and Round Cove and has decreased their enjoyment of beach and water activities.

118.   Excessive nitrogen in coastal embayments like Pleasant Bay and Round Cove from on-site wastewater disposal systems has a devastating effect on the natural ecosystem in a way that harms CLF members.

119.   Defendants' discharges of nitrogen to Pleasant Bay and Round Cove cause and contribute to the eutrophication impairment of those waters and thereby harm CLF members.

120.   When water contains high levels of nitrogen, algae populations reach levels higher than is healthy for the ecosystem, a state known as eutrophication.

121.   In eutrophic waters, an unhealthy amount of algae, organic matter, and ammonia use up too much of the dissolved oxygen in the water, causing oxygen depletion or hypoxia (low oxygen levels). Hypoxia can harm or kill fish, shellfish, and eelgrass (a flowering marine plant native to the coasts of Massachusetts). Shellfish are particularly susceptible to hypoxia because they cannot swim away when the oxygen levels become dangerously low.

122.   Eelgrass cannot tolerate high levels of nitrogen loading. Recent years have seen significant eelgrass bed losses in response to high nitrogen levels in coastal waters.

123.   Eelgrass is harmed by both the low dissolved oxygen levels and the decreased water clarity that characterize eutrophic water. When the water is covered with algae and filled with organic particulates, the eelgrass does not get the light it needs to photosynthesize.

124.   Eelgrass plays a crucial role in Pleasant Bay Watershed ecosystems. Eelgrass beds help prevent erosion and provide important habitats for juvenile fish and benthic animals like clams and shrimp that live on the seafloor bottom. Eelgrass beds are also feeding grounds for many fish, waterfowl, and invertebrates.

125.   High nitrogen levels cause algal blooms and red tides, phenomena that occur when toxin-producing algae grow in out-of-control amounts.

126.    Algal blooms and red tides are harmful to both animal and human water-users, frequently causing fish kills and beach closures.

127.    Excessive algae, including algal blooms and red tides, are aesthetically unappealing, as they decrease water clarity and cover the water in a film of green, green-blue, brown, or red algae. Algae growth also leads to unpleasant odors and scums.

128.    Bird populations are threatened by the loss of their eelgrass feeding grounds, while fish and shellfish populations are threatened by both hypoxia and the loss of eelgrass habitats.

129.    The harmful algal blooms and red tides that accompany eutrophication threaten the ability of CLF members to swim and boat in Pleasant Bay and Round Cove.

130.    Excess nitrogen levels and eutrophication on Cape Cod caused by nitrogen pollution has disrupted the ability of CLF members to recreate in and near the ocean and has diminished their enjoyment of beach and water activities.

131.    CLF members who enjoy looking out at the scenic waters of Pleasant Bay and Round Cove prefer the waters to have a clear, algae-free appearance. When the water is covered with algae and clouded by organic matter, or gives off unpleasant odors, CLF members cannot fully enjoy the waters.

132.    CLF members care about the natural environment of Pleasant Bay and/or Round Cove, and they worry that high nitrogen levels have damaged, and will continue to damage, Pleasant Bay's ecologically important eelgrass beds and irreparably harm local fish and scallop populations.

133.    CLF members enjoy birdwatching and fishing in the waters surrounding Cape Cod including Pleasant Bay and Round Cove, and their enjoyment of these activities is jeopardized by the eutrophication caused by discharges and releases of nitrogen into these waters.

134.    CLF members are concerned that Defendants' continued unauthorized discharge of nitrogen and other pollutants to Pleasant Bay and Round Cove is contributing to the present eutrophication of these waters and will further damage these waters that are already impaired as a result of excessive nitrogen.

135.    CLF members' usage and enjoyment of Pleasant Bay and Round Cove will be reduced due to Defendants' continued unauthorized discharges of pollutants.

136.    The interests of CLF members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Clean Water Act and the National Pollutant Discharge Elimination System.

137.    The Court can redress the harms to CLF members caused and contributed to by Defendants' unlawful discharges through an order requiring Defendants' to comply with Section 301(a) of the Clean Water Act.

138.    The relief sought in this action will redress these harms.

139.    The unlawful acts and omissions described herein are ongoing and continuous and harm Plaintiff's members, for which harm they have no other plain, immediate, or adequate remedy at law.

## CLAIMS FOR RELIEF

**First Cause of Action:**
**Unauthorized Discharge of Pollutants into Waters of the United States**

140.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

141. Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from any "point source" to waters of the United States, except for discharges in compliance with a NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

142. The Sewage Disposal System at the Resort is a "point source."

143. Defendants have discharged, and continue to discharge, pollutants, including nitrogen, to waters of the United States from this point source without a NPDES permit.

144. These pollutants are discharged by the Sewage Disposal System to groundwater which is directly hydrologically connected to waters of the United States.

145. The groundwater acts as a conduit to convey these pollutants through several hundred feet of sandy, glacial outwash materials and then into Pleasant Bay and Round Cove.

146. Each and every day on which Defendants have discharged, and continue to discharge, pollutants without authorization under a valid NPDES permit constitutes a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), and Section 402 of the CWA, 33 U.S.C. § 1342.


**Second Cause of Action:**
**Failure to Obtain and Comply with an Individual NPDES Permit**

147. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

148. Discharges of pollutants from a point source into waters of the United States require NPDES permit coverage.

149. Defendants are and have been required to obtain permit coverage for the point source pollutant discharges from the Sewage Disposal System by seeking and obtaining a NPDES permit, pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342.

150.    Defendants have failed, and continue to fail, to obtain permit coverage under any NPDES permit.

151.    Each and every day on which Defendants have not obtained NPDES permit coverage for the Sewage Disposal System constitutes a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), and Section 402 of the CWA, 33 U.S.C. § 1342.

## RELIEF REQUESTED

152.    Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.    Declare Defendants to have violated and to be in violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), for their unlawful and unauthorized point source discharges of pollutants to waters of the United States;

b.    Enjoin Defendants from discharging pollutants into waters of the United States except as authorized by and in compliance with a NPDES Permit;

c.    Order Defendants to apply immediately for coverage under an individual NPDES permit for their Facility;

d.    Order Defendants to take other appropriate actions to remedy the harm caused by their noncompliance with the Clean Water Act;

e.    Order Defendants to reduce their discharge of nitrogen to a level commensurate with use of modern denitrification technologies, which can reduce concentrations to the 2-3 mg/L range, in order to comply with the technology-based standards of the Clean Water Act;

f.    Order Defendants to pay civil penalties of $37,500 per day per violation for all Clean Water Act violations occurring between January 12, 2009 and November 2,

2015; up to $51,570 per day per violation for all Clean Water Act violations occurring after November 2, 2015 and assessed on or after August 1, 2016 but before January 15, 2017; up to $52,414 per day per violation for all Clean Water Act violations occurring after November 2, 2015 and assessed on or after January 15, 2017; and up to $53,484 per day per violation for all Clean Water Act violations occurring after November 2, 2015 and assessed on or after January 15, 2018, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a), and 40 C.F.R. §§ 19.1–19.4;

g.   Award Plaintiff's costs (including reasonable investigative, attorney, witness, and consultant fees) as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

h.   Award any such other and further relief as the Court may deem appropriate.


## JURY DEMAND

Plaintiff does not request a jury trial.

Respectfully submitted,                                    Dated: August 24, 2018

CONSERVATION LAW FOUNDATION, INC.,

By its attorneys:

*/s/ Zachary K. Griefen*
Zachary K. Griefen, Esq., BBO# 665521
Conservation Law Foundation
15 East State Street, Suite 4
Montpelier, VT 05602
(802) 223-5992 x4011
zgriefen@clf.org

*/s/ Heather Govern*
Heather Govern, Esq., BBO# 688482
Conservation Law Foundation
62 Summer Street
Boston, MA 02110
(617) 350-0990
hgovern@clf.org

/s/ *Christopher M. Kilian*
Christopher M. Kilian, Esq.*
Conservation Law Foundation
15 East State Street, Suite 4
Montpelier, VT 05602
(802) 223-5992 x4015
ckilian@clf.org

*\*Pro Hac Vice Application Filed Concurrently
with Complaint*